IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| ELIZABETH LAWSON, | § | |
| --- | --- | --- |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | |
| | § | CASE NO. 2:13-CV-00105-JRG |
| MARION COUNTY, TEXAS, | § | |
| CITY OF JEFFERSON, TEXAS, | § | |
| TERRANCE MEMS, DAVID | § | |
| QUADA, and CHUCK ROGERS, | § | |
| | § | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER

This case was brought seeking damages asserted under 42 U.S.C. § 1983. The Court conducted a trial before a jury in February of 2014. The jury delivered a verdict for the Defendants on February 7, 2014. The Court now considers Plaintiff Elizabeth Lawson's Renewed Motion for Judgment as a Matter of Law (Dkt. No. 134), which asks the Court to enter judgment as a matter of law ("JMOL") that Defendants Terrance Mems, David Quada, and Chuck Rogers (the "officers" or "Defendants") unlawfully arrested Plaintiff Elizabeth Lawson ("Lawson"), and that Defendants were not entitled to a defense of qualified immunity with respect to Lawson's unlawful arrest claim. Plaintiff also seeks a new trial on damages and on her claim for municipal liability and excessive use of force.

Having considered the issues presented in this motion, the Court finds that Lawson's Motion (Dkt. No. 134) should be DENIED, for the reasons set forth below.

### I. FACTUAL BACKGROUND

The following facts were established at trial and are either undisputed or viewed in the light most favorable to the Defendants, who prevailed at trial.

At approximately 1:00 a.m. on November 4, 2012, a man called the Marion County Sherriff's Department to express concern over a friend, Plaintiff Elizabeth Lawson. Dkt. Nos. 131 at 7–8; 136 at 8. The man identified himself as James Compton, a friend of Lawson. Dkt. Nos. 131 at 9, 245; 136, at 6. Compton told the dispatcher that Lawson had been recently sued for divorce, was "extremely upset," that she had a firearm in her possession, and that she "explained to him that she was ready to check out." Dkt. No. 136 at 8–9. The dispatcher relayed this information to Deputy Chuck Rogers and Deputy David Quada, who were dispatched to Lawson's home for a welfare check. Dkt. No. 131 at 10. The two officers were joined by Officer Terrance Mems of the City of Jefferson Police Department. *Id.* at 11, 99–101. The only officer who previously had contact with Lawson was Deputy Quada, who had personally served Lawson with her divorce papers just a week before. *Id.* at 296.

Sometime between Compton's first call and the time the responding officers arrived at Lawson's home, Compton called the Marion County Sherriff's Department a second time, indicating that Lawson "would be walking out with a weapon in her hand so that the officers would shoot her," in order to commit "officer suicide." Dkt. No. 136 at 9–10. The dispatcher relayed this information to the responding officers. *Id.*

When the officers arrived at Lawson's address, she did not immediately emerge from the house—a single-wide mobile home. The officers approached the house, knocked on the front door, and announced themselves as the Marion County Sherriff's Department. Dkt. No. 131 at 12–13, 102–03, 246–47. The police officers' and Lawson's accounts vary as to what exactly happened next, but undisputedly, at some point shortly after the police arrived and announced themselves, Lawson "hollered" at the officers that she was fine and that the officers should go away. *Id.* at 14, 102–03, 247. Believing their welfare check to be incomplete, the officers

remained and knocked on the door again. *Id.* at 248. Lawson opened the door, cursed at the officers, and slammed the door. *Id.* After knocking a third time, Lawson "opened the door with something behind her back." *Id.* at 249. Deputy Quada "asked her to come out and talk to [him] and show [him] what she had in her hand. She told [him] to go the F away and slammed the door." *Id.* Deputy Quada acknowledged that he did not see any particular object behind Lawson's back; rather, Lawson merely "had her hands behind her back" and was "not showing [him] her hands" so that Deputy Quada could not determine whether her hands were empty. *Id.* at 250–51.

At some point during this set of interactions, Officer Mems left the front of the house and circled around to the back door. *Id.* at 102. He shined a flashlight through the back window, observing Lawson standing in the living room. *Id.* at 104. Officer Mems observed no weapons or anything in Lawson's hands, though "it wasn't a good, clear view." *Id.* Officer Mems then tried the handle of the back door and found that the door was unlocked. *Id.* at 105. Having determined that the door was unlocked, Mems circled back to the front door and informed the other officers of this fact. *Id.* Mems then returned to the back of the house, this time bringing Deputy Rogers with him. *Id.* at 16, 106.

Both Rogers and Mems then looked through the back window of Lawson's single-wide mobile home. Both officers saw Lawson standing by the front door of her home. *Id.* at 16–17, 107–08. Rogers observed "guns on a gun rack" stored on a wall. *Id.*

Officer Mems and Deputy Rogers then entered Lawson's house through the unlocked back door. *Id.* at 251, 255–56. At the same time, Lawson exited through the front door where Deputy Quada was waiting. *Id.* at 251, 255–56. The entry into the house did not directly cause Lawson to be seized. She stepped outside without ever seeing the officers enter her house,

3

testifying, "I didn't see [the officers] come through the back door. As far as I remember, the door was locked and shut." Dkt. No. 135 at 16.

As Lawson came outside the front door, Deputy Quada immediately handcuffed her arms behind her back and sat her down on the porch. Dkt. No. 131 at 27–28, 114, 253. Deputy Quada, through his testimony, stated that Lawson "r[an] out the front door trying to get away from [him]." *Id.* at 296. Officer Mems testified that at this point Lawson was "not free to leave," though he insisted that she was not under arrest, but merely "detained." *Id.* at 114. The officers testified that after being handcuffed Lawson screamed continuously, asking what she had done wrong and "what am I being arrested for?" *Id.* at 27, 120–21, 256–59. The officers told her that she was not charged with anything, but did not release her restraints or allow Lawson to go back into her house. *Id.* at 120. Deputy Quada explained his reason for handcuffing Lawson by testifying, "If I would have let her go, we would have been on a manhunt trying to save this woman, trying to get additional helicopters in there to locate her." *Id.* at 197.

Lawson was admittedly intoxicated, and her behavior toward the officers could be described, charitably, as belligerent and uncooperative. *Id.* at 27–30, 116, 120, 257–59. At one point Lawson slipped her wrists out of Deputy Quada's handcuffs and attempted to return to her house, only to be handcuffed again and returned to the porch. *Id.* at 28, 258. She also refused to talk to emergency medical providers whom the officers offered to call. *Id.* at 27–28, 120, 257–58. After some time, the officers decided to bring Lawson to the Marion County Jail, where she spent the night. *Id.* at 121. Lawson continued to be belligerent and uncooperative throughout her transport to and confinement in the jail; when Officer Mems arrived at the jail with Lawson, she was strapped into a restraint chair because she continued to struggle, kick, and be

uncooperative. *Id.* at 137–41. While strapping Lawson to the restraint chair, Officer Mems discharged a Taser device into Lawson twice, totaling at least seven seconds. *Id.* at 140.

Lawson has now filed this suit, alleging violations of her constitutional rights. At trial, the Court characterized Lawson's claims as alleged violations of her rights under the Fourth Amendment to the United States Constitution—namely, the right to be free from unlawful detention and the right to be free of excessive and unreasonable use of force. The jury found that Lawson had not proven either of these claims by a preponderance of the evidence.

## II. LEGAL STANDARDS FOR JMOL & NEW TRIAL

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "[I]f reasonable persons could differ in their interpretations of the evidence, then the motion should be denied." *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005). "[W]hen evaluating the sufficiency of the evidence, [the court] view[s] all evidence and draw[s] all reasonable inferences in the light most favorable to the verdict." *Id.* at 475.

In considering whether JMOL is appropriate, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 420 (5th Cir. 2003). As a result of these considerations, "[t]he jury's verdict is afforded great deference." *Bryant*, 413 F.3d at 475.

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence,

5

the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). The Court must view the evidence "in the light most favorable to the jury's verdict" and deny the motion for a new trial unless the evidence "points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 770 (5th Cir. 2009) (internal quotation marks and alterations omitted).

## III. DISCUSSION

### A. Fourth Amendment Law

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend IV. It is not disputed that Lawson was seized. The only question, then, is whether the decision to take Lawson into custody was supported by probable cause. The Texas Legislature has defined and codified the standard of probable cause for the type of situation encountered by the officers at Lawson's residence. Tex. Health & Safety Code § 573.001(a).

Under the probable cause standard set by the Texas Legislature, "[a] peace officer, without a warrant, may take a person into custody if the officer: (1) has reason to believe and does believe that: (A) the person is mentally ill; and (B) because of that mental illness there is a substantial risk of serious harm to the person or to others unless the person is immediately restrained; and (2) believes that there is not sufficient time to obtain a warrant before taking the person into custody." Tex. Health & Safety Code § 573.001(a). This "reason to believe" standard equates to probable cause. *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir.

6

2012). Furthermore, the standard possesses both an objective and a subjective element. Tex. Health & Safety Code § 573.001(a).

The Texas code defines mental illness as a "condition" that (1) substantially impairs a person's thought, perception of reality, emotional process, or judgment; or (2) grossly impairs behavior as demonstrated by recent disturbed behavior. *Id.* § 573.003; *Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012). Persons considered to be "suicidal" meet this definition. *Cantrell*, 666 F.3d at 923.

### 1. Probable Cause Determination—Objective Element

If a "concerned third party" contacts police officers and informs the officers that there is a potentially suicidal person with whom the third party had recent contact, then the officers are justified in using that representation and a subsequent investigation to support probable cause under the Texas standard. *Martinez v. Smith*, 200 F.3d 816, 1999 WL 1095667, at *2 (5th Cir. 1999) (per curiam) (unpublished table disposition). In *Martinez v. Smith*, a person described as a concerned third party and "someone familiar" with a potential suicide victim had recently contacted the potential victim and learned the potential victim was suicidal. *Id.* at *1. The concerned third party contacted the police and told the officers that the potential victim kept a gun in her house and was contemplating suicide. *Id.* at *1, *3. Officers went to the potential victim's house where she insisted she was fine, but confirmed that she and her ex-husband recently had a disagreement. *Id.* at *3. The victim attempted to close the door on the officers before they could discuss matters in any detail. *Id.* Some of the potential victim's conduct seemed odd to officers, including sitting down on the floor after an officer prevented her from closing the door. *Id.* The officer at the door, believing that he needed more time to evaluate whether the victim was suicidal, grabbed the potential victim's wrist through the door. *Id.* at *3.

"Confronted with an uncooperative, possibly suicidal person who might have access to a firearm," the officer handcuffed her and took her into custody under the Texas statute. *Id.* at *3. "Based on the Texas statute, the information from a third party, and their own observations, the deputies had probable cause to take [the potential victim] into protective custody." *Id.* at *2.

The factual situation of *Martinez v. Smith* is very closely analogous to the present case. James Compton—a person familiar with Lawson who had recent contact with Lawson—informed the police that Lawson was suicidal. Dkt. No. 136 at 8–9. Compton informed the officers that Lawson owned a gun. *Id.* The officers went to Lawson's residence where she insisted she was fine. Dkt. No. 131 at 14, 102–03, 247. The officers, by virtue of serving the divorce papers just one week prior, knew that Lawson was in the midst of a substantial disagreement with her soon-to-be ex-husband. *Id.* at 296. Lawson attempted to close on the door on the officers before they could discuss matters in any detail. *Id.* at 248. Some of Lawson's conduct seemed odd to the officers, including swearing at the officers and hiding her hands behind her back. *Id.* at 294, 302. Confronted with an uncooperative, possibly suicidal person who might have access to a firearm, the officer then handcuffed her. *Id.* Based on the Texas statute, the information from a third party, and the officers' observations, this Court holds that a reasonable jury could properly conclude that the officers had probable cause to take Lawson into protective custody. *Martinez*, 1999 WL 1095667, at *2.

### 2. The Credibility of James Compton

Given the similarity of these facts with the above case, the only question left for the jury and this Court to resolve was whether James Compton was credible, which is one of the requirements of Texas Health and Safety Code § 573.001(c). The peace officer may form the "reason to believe" that the person meets the criteria for apprehension from the representation of

a credible person. Tex. Health & Safety Code § 573.001(c). Since the law enforcement officers, here, relied upon the representations of a third party, this Court looks to Fourth Amendment situations in which outside parties provided the information used to establish probable cause. In these situations, both the United States Supreme Court and the Fifth Circuit have observed that an informant's tip can be deemed credible if corroborated by an officer's investigation—even if no illegality is independently observed by the officer—and can be used to establish probable cause under the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 246 (1983). The Fifth Circuit has also observed that when the caller is not anonymous, but merely unknown to police, "'the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case.'" *United States v. Blount*, 123 F.3d 831, 836 (5th Cir. 1997) (quoting *United States v. Fooladi*, 703 F.2d 180, 183 (5th Cir. 1983)). "There is no set requirement that *all* tips be corroborated by subsequent police investigation in order to be considered credible. Whether subsequent corroboration is necessary must be determined in the light of the totality of the circumstances presented by the particular set of facts." *Id.* (emphasis added). When assessing a citizen's credibility, "the immediacy of the investigation . . . is also a relevant consideration." *Blount*, 123 F.3d at 837.

This Court finds that the jury could have reasonably concluded, based on the evidence presented at trial, that the officers found the caller—James Compton—to be credible, and that his statements supported a finding of probable cause. The United States Supreme Court has confirmed that officers may take into account the totality of the circumstances when determining whether a caller is credible, that "probable cause is a fluid concept," and that the officer investigating a caller's predictions need not independently observe the offending activity to deem an anonymous tip credible. *Illinois v. Gates*, 462 U.S. 213, 229–30, 232 (1983). *Gates*

9

addressed a situation where an anonymous letter was sent to the police department containing a description of a drug transportation operation. *Id.* at 229. The police verified some of the representations made in the letter, but did not independently observe any criminal activity. *Id.* at 229–30. The Supreme Court concluded that the anonymous letter alone could not support probable cause, but that under the totality of the circumstances approach, the letter was corroborated through independent investigation and was therefore credible. *Id.* at 233. It could then be used to establish probable cause. *Id.* As the High Court held, it was "enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a substantial basis for crediting the hearsay." *Id.* at 244–45 (internal quotation marks omitted). As the Plaintiff in the present case correctly points out, only facts and circumstances that occurred before the seizure of Lawson are relevant to this credibility determination. Pl.'s Reply Supp. Of Pl.'s JMOL at 5–6 (citing *Johnson v. United States*, 333 U.S. 10, 16 (1948)).

The facts and circumstances established and corroborated before the seizure in the present case sufficiently provide a reasonable officer the basis to conclude that the caller was credible, which gave the officers "reason to believe" that Lawson posed a risk of substantial harm to herself. The caller stated that Lawson was going through a recent divorce, which the officers independently corroborated because Deputy Quada had personally served her with the divorce papers just one week before. Dkt. Nos. 136 at 7; 131 at 296. The caller stated that Lawson was alone at her residence, which was independently corroborated by the officers upon their arrival. Dkt. Nos. 136 at 7; 131 at 32. The caller stated that Lawson was in a negative mental state and was acting erratically, which the officers independently corroborated when she started cursing at them upon their arrival. Dkt. Nos. 136 at 7–8; 131 at 294, 302. The caller

10

stated that Lawson would be anticipating the officers' arrival, which the officers independently corroborated when she shouted "I'm fine" before being asked. Dkt. Nos. 136 at 9–10; 131 at 225. The caller said there were weapons in the home, which the officers independently corroborated before her seizure. Dkt. No. 136 at 8–9; 131 at 16–17, 107–08. Considering the above and that the caller was willing to identify himself to the county dispatcher, and when further coupled with the fact that it was the middle of the night and that Lawson refused to show the officer her hands when asked, the officers—including the arresting officer, Deputy Quada—had adequate reason to believe the caller was credible based on the totality of the circumstances. The officers therefore had an adequate basis to conclude that there was a high risk that Lawson was mentally ill and contemplating suicide. "[T]he police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case." *United States v. Blount*, 123 F.3d 831, 836 (5th Cir. 1997). Furthermore, there was enough corroboration such that the chances that the caller was telling a reckless or prevaricating tale were substantially reduced, thus providing a valid basis for crediting the hearsay. *Gates*, 462 U.S. at 244–45. The Court concludes that the jury properly found that the officers had probable cause based on a credible caller's statements.

Plaintiff argued that the testimony elicited at trial shows that the officers formed no belief about the caller's credibility at the time of the phone call, and that when the officers arrived, they only observed innocent—i.e., noncriminal—activity. However, using the guidance of this Circuit and the United States Supreme Court, an officer need not assume the person calling is not credible, the officer may conduct a reasonable investigation, and then, based on the totality of the circumstances, that officer may make a judgment call regarding the caller's credibility. *Gates*, 462 U.S. at 233; *Blount*, 123 F.3d at 836–37. This credibility can be established by observations

of innocent activity alone, *Gates*, 462 U.S. at 229–30, and the immediacy of the investigation is relevant. *Blount*, 123 F.3d at 837. As a result, the caller's credibility at the time of the phone call only starts the analysis, as the caller's ultimate credibility should be assessed as of the time of the seizure. Plaintiff's counsel did question Deputy Rogers regarding the caller's credibility and the fact that Lawson did not come out waiving a pistol. Dkt. No. 131 at 23. Although Lawson did not come out waiving a gun, "there is no set requirement that *all* tips" or even all the specific details about a tip, "be corroborated . . . ." *Blount*, 123 F.3d at 837. Instead the Court uses a totality of the circumstances approach. *Gates*, 462 U.S. at 233. When Deputy Rogers was asked by his counsel whether "the information provided by the caller . . . was consistent with what [he] was observing and what he was told"—which is more probative of the totality of the circumstances standard—Deputy Rogers replied, "Yes." Dkt. No. 131 at 78. Plaintiff's counsel similarly asked Officer Mems whether the phone call or the fact that Lawson would not come out of the house, taken independently, gave the officers' probable cause.[1] *Id.* at 111–13. Officer Mems responded that it did not, but instead insisted that he had probable cause based on "the fact

---

[1] Plaintiff's counsel probed Officer Mems's reasons for entering Lawson's home:
    Q: Now, you know, Officer Mems, that the fact that – well, without knowing anything about this person or their credibility or whether or not they're making false reports or accurate reports, that call doesn't give you probable cause to go into Ms. Lawson's home, does it?
    A: No, sir.
    Q: So what you're telling this jury is that you had the right to go into Ms. Lawson's home because she had refused to open the door to you at 1:00 o'clock in the morning?
    A: Well, due to the fact some of the things the caller said and her not wanting to come out and talk to us and let us know that she was safe and okay.
    Q: Those are the two things. It's the caller and the fact that she won't open the door, right?
    A: Yes, sir.
    Q: The caller doesn't give you probable cause because you don't know anything about him, right?
    A: No, sir, I didn't.
    Q: Which leaves the property and the fact that she won't open the door to you at 1:00 o'clock in the morning?
    A: Correct.
    Q: The fact that an American citizen does not open the door to the police at 1:00 o'clock in the morning doesn't give the police probable cause to invade their home, does it?
    A: No, sir.
Dkt. No. 131 at 111–13.

some of the things the caller said *and* her not wanting to come out and talk to us and let us know that she was safe and okay." *Id.* at 113 (emphasis added). This again more properly looks to the totality of the circumstances. Deputy Quada, who actually made the seizure, stated that "[c]onsidering the totality of all the things leading up to the officers going in the home—that being justifiable due to her irrational behavior, not willing to even speak with us—was a very big concern; and not showing her hands. Officers had no choice but to do what we had to do to protect her, as well as ourselves." *Id.* at 303. These concerns were echoed by the other officers. The jury could therefore properly conclude that the caller was credible based on the police officers' perceptions of the totality of the circumstances occurring before the seizure.

Reasonable jurors could conclude that the totality of the circumstances justified the officer's reliance on the caller, which in turn supported a finding of probable cause. The facts and circumstances within the officers' knowledge at the time of the seizure are sufficient for a reasonable person to conclude that Lawson was suffering from a mental defect and posed a substantial risk of serious harm to herself. *See Cantrell v. City of Murphy*, 666 F.3d 911, 923 (5th Cir. 2012) (holding that the "reason to believe" aspect—the "probable cause" standard—"exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm."). An essential part of the jury reaching this conclusion hinges upon precise credibility determinations made by the jury. This Court cannot alter or replace the jury's credibility conclusions with its own. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). Since there exists an evidentiary basis upon which reasonable jurors could reach their stated conclusion, this issue must be resolved in favor of the jury verdict. *See Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005).

### 3. Probable Cause Determination—Subjective Element

Having established that a sufficient evidentiary basis existed for reasonable jurors to conclude as this jury did concerning the credibility of the caller and the issue of probable cause, the Court next turns to the subjective element—whether the officers who arrived on scene actually believed that Lawson was mentally ill and posed a risk of serious harm (as defined by the Texas Health & Safety Code). When testifying, all the officers expressly indicated a belief that Lawson's safety was at risk or the officer's safety was at risk. For example, Officer Mems testified:

> Q. Did you have a concern that if you did not enter the house, something bad might happen?
>
> A. Yes, sir.
>
> Q. What was that bad thing that might happen?
>
> A. That she might kill herself.

Dkt. No. 131 at 185. Deputy Rogers, when asked whether his own personal observations led him to be concerned for Lawson's well-being, replied that it did. *Id.* at 68. Deputy Quada, when asked about the consequences of Lawson answering the door with her hands behind her back, stated "I was afraid for her and myself and the other officers." He further believed that when Lawson exited the front door, "if [he] would have let her go, [they] would have been on a manhunt trying to save this woman, trying to get additional helicopters in there to locate her." *Id.* at 197.

The jury was charged to determine whether the officers subjectively believed that there was a substantial risk of harm to Lawson. The jury made the credibility determinations necessary to determine that the officers held that subjective belief. The record sufficiently

supports this conclusion. The Court will not substitute its own credibility determinations for those of the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000); *Bryant v. Compass Group USA Inc.*, 413 F.3d 471, 475 (5th Cir. 2005).

### B. Constitutionality of Warrantless Entry into Lawson's Home

Finally, the Court must determine whether there was a justifiable reason for the officers' warrantless entry into Lawson's residence. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (citation and internal quotation marks omitted). Under the exigent circumstances exception to the warrant requirement, however, the Supreme Court has recognized that police officers are not required to obtain a warrant where "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal quotation marks omitted). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* Further, the Fifth Circuit has now expressly held "that the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." *Rice v. ReliaStar Life Ins. Co.*, -- F.3d –, 2014 WL 5431994, at *6 (5th Cir. Oct. 27, 2014).

When officers receive a 911 phone call from a credible person stating that a potential victim is threating to commit suicide, has been drinking, and has a problem with law enforcement, the officers are justified in entering the home without a warrant to save the potential victim's life. *Rice v. ReliaStar Life Ins. Co.*, --F.3d--, 2014 WL 5431994, at *1, *6 (5th Cir. Oct. 27, 2014). In *Rice*, the police relied on the representations of a 911 caller who stated

15

that the potential victim had a gun and was threatening suicide. *Id.* at *1. Officers did not observe a gun or the potential victim before they entered the potential victim's house without a warrant. *Id.* at *5. Once inside, the officer tragically shot and killed the potential victim. *Id.* at *1. The Fifth Circuit held that "the threat that an individual poses to himself may create an exigency . . . ." *Id.* at *6. Noting that "courts must still determine whether the actions of the law enforcement officer who entered without a warrant were objectively reasonable," *id.* at *6, the Fifth Circuit found that exigent circumstances existed and the officer's entry was objectively reasonable based on the facts that occurred before the warrantless entry. *Id.* at *7.

In the present case, the facts as found by the jury support a finding of justifiable warrantless entry. Just as in *Rice*, the 911 dispatcher received information that a potential victim—Lawson—was acting erratically and threatening to commit suicide. *Rice*, 2014 WL 5431994, at *1. The caller also indicated that Lawson had a gun, just as occurred in *Rice*. *Id.* In addition, the caller said Lawson might come out waiving that gun in an attempt to commit suicide by police officer, suggesting Lawson had a problem with law enforcement showing up, just as occurred in *Rice*. *Id.* In the present case, however, the officers actually observed weapons in the home before entry, which lends additional support to a conclusion of justifiable warrantless entry. The Court must determine whether the actions of the law enforcement officer who entered without a warrant were objectively reasonable, and based on the facts that occurred before this warrantless entry, those actions were reasonable in this case under both the jury's factual findings and the reasoning discussed in *Rice*. *Id.* at *6–7.

### C. Excessive Force Claims

The Court next turns to Lawson's excessive force claim. An excessive force claim under the Fourth Amendment must demonstrate (1) injury, (2) which resulted directly and only from a

clearly excessive force, and (3) the excessiveness of which was clearly unreasonable. *Bush v. Strain*, 513 F.3d 492, 500–01 (5th Cir. 2008). "With respect to a claim of excessive force, the same [Fourth Amendment] standard of reasonableness at the moment applies." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

The evidence on the record shows that the Defendant's use of force at the Marion County Jail was not "clearly unreasonable" under the third prong of the above test. While Lawson was partially restrained and screaming profanity, she reached "all the way back," and using "all her power," delivered a "good kick" to jailer Dan Ross's chest. Dkt. No. 131 at 188. This action caused Officer Mems to discharge his Taser for two or three seconds, which he believed did not "have much effect." *Id.* at 190. Officer Mems then testified that he "warned her that she would get tased if she kept kicking." *Id.* Lawson then kicked jailer Ross again, which caused Mems to discharge his Taser a second time. *Id.* Only after the second tase was Lawson fully restrained. *Id.* Officer Mems testified that if he not used his Taser, it would been an "all out fight." *Id.* A reasonable jury could properly find this evidence sufficient. The Court will not overturn this finding when doing so could only be accomplished by supplanting the jury's considered judgment as to the credibility of the witnesses and its assignment of weight to the evidence presented.

### D. Qualified Immunity

"Qualified or 'good faith' immunity is an affirmative defense . . . ." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). The United States Supreme Court has "held that qualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff, or if he took the action with the malicious intention to cause a deprivation of

17

constitutional rights or other injury." *Id.* (internal quotations omitted). Since the jury found that the officers' actions were constitutional, it did not need to reach the issue of qualified immunity.

### E. Claims Against Marion County and City of Jefferson

If no underlying constitutional violation is found, no municipal liability results. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Since Marion County and the City of Jefferson were only sued on the theory that they were legally responsible for their law enforcement officers' unconstitutional actions, the fact that the jury found no underlying constitutional violation forecloses the possibility of liability for the City and the County. *Id.*

### F. New Trial Analysis

Finally, the Court reaches the issue of whether a new trial should be granted. In light of the above, it is clear to the Court that the jury verdict in this case is not against the great weight of the evidence, that a reasonable jury could have reached the verdict that they reached, and that the evidence does not overwhelmingly favor Lawson. *See Alaniz v. Zamora-Quezada*, 591 F.3d 761, 770 (5th Cir. 2009) (setting forth standards for a new trial). Accordingly, a new trial is not warranted in this Court's view. *Id.*

## IV. CONCLUSION

For the reasons set forth above, the Plaintiff's Motion for Judgment as a Matter of Law is DENIED. Similarly, for the reasons set forth above, the Plaintiff's Motion for a New Trial is DENIED.

**So ORDERED and SIGNED this 5th day of November, 2014.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE